IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:11-CV-190-FL

BENJAMIN ERICHSEN,                    )
                                      )
        Plaintiff,                    )
                                      )
    v.                                )
                                      )            ORDER
                                      )
RBC CAPITAL MARKETS, LLC,             )
                                      )
        Defendant.                    )

    This matter is before the court on defendant's motion to compel arbitration and stay action

(DE # 10), defendant's motion to seal selected exhibits (DE # 12), and plaintiff's motion to strike

(DE # 18) paragraph 11 from the declaration of Christian Park (Exhibit A to defendant's motion to

compel). The parties have responded in opposition to each of the motions and have also filed

replies. In this posture, the issues raised are ripe for review. Based on the following, the court

grants plaintiff's motion to strike, grants defendant's motion to compel arbitration and stay, and

denies defendant's motion to seal.

## STATEMENT OF THE CASE

    Plaintiff filed complaint in the Superior Court of New Hanover County, North Carolina, in

May 2011, alleging fraud, unfair and deceptive trade practices, unjust enrichment, breach of implied

contract, negligent misrepresentation, and negligence. On September 9, 2011, defendant removed

to this court based on diversity jurisdiction. Shortly thereafter, on October 21, 2011, defendant filed

the instant motion to compel arbitration. Contemporaneously, defendant filed the instant motion to

seal certain exhibits filed in support of the motion to compel. Plaintiff opposes both motions. On

December 8, 2011, plaintiff filed motion to strike a particular paragraph from an affidavit submitted in support of defendant's motion to compel. No scheduling or case management order has been entered.

## STATEMENT OF FACTS

The facts, as alleged by plaintiff in the complaint, are as follows. Plaintiff has been a successful securities trader since 2000. In 2002, plaintiff opened a trading account with an entity he describes as the Carlin Financial Group.[1] For the reasons set forth below the line, the court refers to the entity that plaintiff traded with and that plaintiff signed two Risk Disclosure Statements ("RDS") with as "Carlin." From approximately 2004 through 2007, plaintiff traded with Carlin, averaging approximately $750,000.00 annually in post-commission trading profits.

In 2003, plaintiff signed an agreement with Carlin entitled "Risk Disclosure Statement and Trading Acknowledgment Agreement" (previously referred to as a RDS). See Park Decl. Ex. 5. Plaintiff signed his initials at the bottom of each page of the agreement, which agreement is between plaintiff, the trader, and Carlin Equities Corporation, its employees, representatives, officers, directors, agents, successors and assigns. Id. The agreement discusses the risks associated with day trading, other forms of trading, and use of Carlin's systems and resources to trade. It discusses information provided by Carlin for its traders and matters regarding commissions. Additionally, the agreement contains an unambiguous arbitration clause which states that arbitration is final and

---

[1] There appears to be some dispute between the parties as to whether plaintiff's trading account was with The Carlin Financial Group or Carlin Equities Corporation. The latter changed its name to Carlin Owners Corporation in 2006, and that entity was acquired by defendant. Park Decl. ¶¶ 5-6. As described herein, there is no dispute that plaintiff signed two risk disclosure statements with Carlin Equities Corporation between 2003 and 2009. Additionally, while plaintiff suggests there is an issue of fact over whether his account was with The Carlin Financial Group and whether that entity was even acquired by defendant, see Pl.'s Resp. Opp'n 3 n.2, this appears to be a nonissue where plaintiff also acknowledges in the complaint that in "January of 2007, Defendant acquired Carlin." Compl. ¶ 9. Additionally, the point becomes moot based on the court's analysis of the risk disclosure statements plaintiff signed with Carlin Equities Corporation, which statements were assigned to defendant.

binding on the parties and that the parties waive their right to seek remedies in court, including the right to a jury trial. Id. at 7. There is no signature from any individual on behalf of Carlin in the 2003 RDS.

Plaintiff signed a similar RDS at a later unknown date. Park Decl. Ex. 6. The second RDS displays "Carlin Equities Corporation" at the top of the first page and contains similar warnings and information as the 2003 RDS. As with the 2003 RDS, plaintiff signed his initials on every page as well as at the end of the document. There is no signature from any individual affiliated with Carlin. The later RDS also contains an "Arbitration Disclosure." The disclosure states that "[b]y signing an arbitration agreement the parties agree" that they are giving up the right to sue each other in court, including right to a trial by jury. The second RDS appears to be missing a page. Id. at 8 (reading that it is page 8 "of 9" yet there is no ninth page).

In January 2007, defendant acquired Carlin, and announced the introduction of the RBC Accel trading platform. Thereafter, for approximately sixteen (16) months, defendant offered traders like plaintiff the option of continuing to trade on the Carlin platform or use the Accel platform. Plaintiff chose to continue with the Carlin platform because of his past success with it. He did this from 2007 through the spring of 2008. During early 2008, defendant urged plaintiff to move his trading to the Accel platform, informing plaintiff that the Carlin platform was in the process of being eliminated. During this trial period of plaintiff's use of Accel, plaintiff noticed that the Accel platform was not as functional as the Carlin platform, and that it had other problems, including "'stale' market data, slower execution, and other issues.'" Compl. ¶ 13. Plaintiff communicated these problems to defendant, and defendant's representatives told plaintiff the problems would be addressed.

Plaintiff continued to trade using the Carlin platform until March or April of 2008, when defendant abandoned it. When plaintiff began to use Accel, he encountered the same problems previously experienced. Plaintiff reported the problems, and defendant's representatives assured the problems were being addressed. Simultaneously, plaintiff alleges that defendant was dismantling its trading division. As part of this process, defendant terminated plaintiff's personal representative, and plaintiff's questions were passed around to different employees, none of whom seemed to have knowledge of plaintiff's history or trading.

In the summer of 2009, plaintiff experienced new problems with Accel, including "consistent missing market data and orders functioning improperly." Compl. ¶ 20. Plaintiff received an email from one of defendant's representatives in which the representative acknowledged that problems had arisen because of a lack of infrastructure. Plaintiff continued to communicate with defendant throughout 2009 regarding problems he was experiencing. Plaintiff also began to inquire of defendant whether the Accel platform was being sufficiently supported. After repeated inquiries, plaintiff received response from defendant denying any intent to phase out retail traders and the Accel platform. In October or November 2009, plaintiff was informed by two of defendant's representatives, in separate conversations, that defendant would not longer support retail traders like plaintiff, and that defendant was focusing on its core business of servicing institutional traders.

Plaintiff states that his profits dropped precipitously immediately following the switch to the Accel platform. His profits remained significantly lower that his historic average after the switch to Accel. Plaintiff alleges that during this time, defendant reaped commissions from defendant far in excess of plaintiff's trading profits.

Plaintiff filed civil suit in New Hanover County Superior Court on May 17, 2011, alleging

4

fraud, unfair and deceptive trade practices, unjust enrichment, breach of implied contract, negligent misrepresentation, and negligence.

## DISCUSSION

A.    Motion to Strike

The court first addresses plaintiff's motion to strike paragraph 11 of the Park Declaration (Exhibit A to defendant's motion to compel arbitration) because the language at issue bears on the court's consideration of the motion to compel arbitration.

The parties do not dispute that the standard for deciding a motion to compel arbitration brought under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, is a standard similar to a motion for summary judgment.  See Minter v. Freeway Food, Inc., 2004 WL 735047 at *2 (M.D.N.C. Apr. 2, 2004) (citing case law from the Second, Third, Seventh, and District of Columbia circuits); see also Shaffer v. ACS Govt's Servs., Inc., 321 F.Supp.2d 682, 683-84 n.1 (D. Md. June 15, 2004); Rose v. New Day Finan., LLC, 816 F.Supp.2d 245, 251 (D. Md. Sept. 9, 2011).

Accordingly, arbitration should be compelled where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to find for the non-moving party).  The party seeking to compel arbitration bears the initial burden of demonstrating the absence of any genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate with specific evidence that there exists a genuine issue of material fact requiring trial.  Matsushita Elec. Indus.

5

<u>Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986). In opposing the motion to compel arbitration, plaintiff has requested that if the court finds a genuine issue of fact on the question of whether a valid agreement to arbitrate the claims exists, that a jury trial be conducted to determine the issue.

Rule 56 provides that a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. Fed. R. Civ. P. 56(c)(2). An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(2).

Paragraph 11 of the Park Declaration states as follows:

> 11.    In addition, Erichsen also signed an undated Trading Agreement. Based on the dates of the other account documents believed to be completed or submitted by Erichsen at the same time as this Trading Agreement, it was entered by Erichsen on or about March 20, 2007. A true and correct copy of the Trading Agreement is attached as <u>Exhibit 6</u>.

Park Decl. ¶ 11.[2] Plaintiff takes issue with the word "believed," arguing that the declaration is clearly not made on personal knowledge and is inadmissible hearsay. Plaintiff argues that nothing in the record corroborates the statement.

Generally, an affidavit filed in opposition to a motion for summary judgment must present evidence in substantially the same form as if the affiant were testifying in court. <u>Evans v. Technologies Applications & Service Co.</u>,80 F.3d 954, 962 (4th Cir.1996). Federal Rule of Civil Procedure 56(e) specifically requires that affidavits submitted on summary judgment contain

---

[2] The "Trading Agreement" Park refers to is the same document previously referred to herein as the second RDS.

admissible evidence and be based on personal knowledge. <u>Id.</u>; <u>see also</u> <u>Williams v. Griffin</u>, 952

F.2d 820, 823 (4th Cir.1991) (evidence submitted in opposition to summary judgment motion must

be admissible and based on personal knowledge). Thus, summary judgment affidavits cannot be

conclusory, <u>Rohrbough v. Wyeth Laboratories, Inc.</u>, 916 F.2d 970, 975 (4th Cir. 1990), or based

upon hearsay, <u>Maryland Highways Contractors Ass'n v. Maryland</u>, 933 F.2d 1246, 1252 (4th Cir.

1991).

Park's declaration reveals that as part of his job responsibilities, he is familiar with

defendant's acquisition of the business of the Carlin Group, LLC's companies, including Carlin

Equities Corporation. Park. Decl. ¶ 2. However, the court agrees with plaintiff that Park's

declaration regarding the date on which the undated RDS was signed is not based on personal

knowledge. Not only does he suggest that he "believes" the date to be March 20, 2007, but his

belief is not based on incontrovertible facts or documents included in the record. As plaintiff points

out, Park's belief is based on "other account documents believed to be completed or submitted by

Erichsen" at the same time as the undated RDS. Those "other account documents" are not described

specifically in the declaration, nor are they attached to the same as exhibits. Furthermore, defendant

provided no further explanation of these documents, which might have offered factual support for

Park's statement. The case law defendant offers in support is simply not persuasive in light of the

plethora of cases that hold that Rule 56 affidavits must be based on personal knowledge and not

conjecture or belief. <u>See, e.g.</u>, <u>Ambling Mgmt. Co. v. Univ. View Partners, LLC</u>, 581 F. Supp. 2d

706, 720 (D. Md. Oct. 8, 2008); <u>Malina v. Baltimore Gas & Elec. Co.</u>, 18 F. Supp. 2d 596, 605 n.4

(D. Md. Sept. 28, 1998).

Accordingly, plaintiff's motion to strike is granted. However, the court grants it only to the

extent necessary to strike portions of the statement made without personal knowledge. Therefore, the sentence beginning with "Based on . . ." and ending with " . . . on or about March 20, 2007" is stricken, and will not be considered by the court in its determination of the motion to compel arbitration.

B.    Motion to Compel Arbitration

As noted above, the standard for deciding a motion to compel arbitration brought under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, is similar to the standard applicable to a motion for summary judgment. See, e.g., Minter, 2004 WL 735047 at *2. The Federal Arbitration Act, *199 9 U.S.C. §§ 1–14 (2006), provides that a written arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; Mawing v. PNGI Charles Town Gaming, L.L.C., 426 Fed.App'x. 198-199 at *1 (4th Cir. 2011).

The Supreme Court has repeatedly emphasized "that arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." United Steel, Paper And Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Intern. Union AFL-CIO/CLC, Local No. 850L v. Cont'l. Tire N. Am., Inc., 568 F.3d 158, 163-64 (4th Cir. 2009) (citing AT & T Technologies, Inc. v. Comm'ns Workers of Am., 475 U.S. 643, 648 (1986) (internal quotation marks omitted)). See also Nolde Bros., Inc. v. Local No. 358, Bakery and Confectionery Workers Union, 430 U.S. 243, 250-51 (1977) (noting prior cases holding that "a party cannot be compelled to arbitrate any matter in the absence of a contractual obligation to do so"); Gateway Coal Co. v. United Mine Workers of America, 414 U.S. 368, 374 (1974) ("The law compels a party to submit his grievance to arbitration only if he has contracted to do so.").

To compel arbitration, the movant must show: (1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the [other party] to arbitrate the dispute. Rose v. New Day Finan., LLC, 816 F.Supp.2d 245, 252 (D. Md. 2011) (citing *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500–01 (4th Cir.2002)); see also Hightower v. GMRI, Inc., 272 F.3d 239, 242 (4th Cir. 2001).

In assessing arbitrability, a court is obliged to give effect to the intentions of the parties, but any ambiguities regarding the scope of an arbitration clause should be resolved in favor of arbitration. Wachovia Bank, Nat'l Ass'n v. Schmidt, 445 F.3d 762, 767 (4th Cir. 2006); see also Mawing, 426 F. App'x. at *1. In deciding whether a party agreed to arbitrate based on the contract, the court should apply "ordinary state-law principles that govern the formation of contracts." Johnson v. Circuit City Stores, 148 F.3d 373, 377 (4th Cir. 1998) (citing First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995)).

Neither party disputes that North Carolina state law should determine whether plaintiff and defendant have a contract to arbitrate the instant dispute. Plaintiff's principle argument is that no valid agreement to arbitrate exists. With respect to the two RDS agreements, plaintiff argues that neither constitutes a valid agreement to arbitrate because they are not signed by defendant, nor are they signed by Carlin, the other party to the agreements. Defendant acknowledges that the later RDS "superseded the first," and was signed in March 2007. As previously noted, plaintiff strongly disputes that the second RDS was signed in 2007, and further argues that where neither Carlin nor

defendant signed the second RDS, it is not enforceable.[3]

As a preliminary matter, plaintiff's argument that the second RDS is unenforceable because the last page appears to be missing is unavailing. The North Carolina Court of Appeals case plaintiff cites to argue that the law is "clear that an incomplete document purporting to be a contract will not be enforced in its incomplete form" appears not to stand for this particular proposition. See Parker v. Glosson, 182 N.C. App. 229, 233-34, 641 S.E.2d 735, 738 (2007) (discussing that where a contract expressly provided that it only became enforceable when a fully executed copy was communicated to the parties and no fully executed copy was ever communicated, a valid contract did not exist).[4]

First, the court analyses whether the RDS agreements between Carlin and plaintiff were validly assigned to defendant when Carlin was acquired by defendant. The parties do not dispute what is required for a valid assignment under North Carolina law. A valid assignment "must

---

[3] While the parties have argued vigorously over whether the court should find that the second RDS was signed in the spring of 2007, the court declines, based on rulings made herein, to make any finding as to when the second RDS was or might have been signed. However, as the following analysis demonstrates, where both parties acknowledge that the later RDS was signed after the 2003 RDS and supersedes the same, exactly when the later RDS was actually signed is not a crucial issue, especially where the question to be answered is only whether the second RDS was validly assigned to defendant and whether it is enforceable against plaintiff under principles of state contract law.

[4] Plaintiff does not cite to any authority holding that the second RDS cannot be considered by the court despite the fact that the exhibit is missing the ninth page. Defendant does not address this point in the briefings. Plaintiff offers a suggestion as to what the missing page might contain, a signature block for Carlin. See Pl.'s Resp. Opp'n 13 n.16. Even construing any inferences of what the missing page contains in favor of plaintiff, the absence of a signature on behalf of Carlin does not, under the law, make the agreement unenforceable. See Elina Adoption Services, Inc. v. Carolina Adoption Services, Inc., 1:07CV169, 2008 WL 4005738 (M.D.N.C. Aug. 25, 2008) (citing Burden Pallet Co., Inc. v. Ryder Truck Rental, 49 N.C.App. 286, 289, 271 S.E.2d 96, 97 (1980)) ("a signed writing is not essential to the validity of a contract; '[a]ssent may be shown in other ways, such as acts, or conduct or silence.'"). Where plaintiff has alleged his past success in using the Carlin platform, a relationship described and outlined in the RDS agreements, plaintiff has essentially alleged that the parties undertook obligations and retained benefits pursuant to mutually agreed upon terms, and has sufficiently alleged the existence of a valid and enforceable contract despite the lack of Carlin's signature on the document. Id. Furthermore, plaintiff has not cited any case law, nor has the court located any, which would unilaterally prohibit the consideration of the unambiguous language in the undated RDS agreement regarding arbitration to which plaintiff indicated his agreement through signing.

designate the assignor, the assignee, and the thing assigned." See Morton v. Thornton, 259 N.C. 697, 699, 131 S.E.2d 378, 380 (1963). Plaintiff's response in opposition argues that trading agreements like the RDS agreements were not assigned in the purchase and sale agreement, referred to by plaintiff as the Asset Purchase Agreement ("APA"). The court's review of the plain language of the APA and related documents reveals otherwise.

Plaintiff is correct that section 2.01 of the APA identifies the assets sold, conveyed, transferred, assigned and delivered. See Park. Decl. Ex. 2, § 2.01. Specifically, section 2.01(c) includes in the assigned assets "Contracts Related to the Business." Id. § 2.01(c). "Contract" is defined in the APA as "with respect to any person, any agreement, indenture, undertaking, debt instrument, contract, lease, understanding, arrangement or commitment, whether or not in writing, to which such person or any of its Subsidiaries is a party, or by which such person or any of its Subsidiaries may be bound or to which any of their properties may be subject." Id. § 1.01. "Related to the Business" is also defined as "required for, related to or used in connection with the Business." Id. "The Business" means the securities, broker-dealer, commodities, investment management and investment advisory business as conducted by the sellers, Carlin among them, and its affiliates. Based on these definitions, an agreement between Carlin and plaintiff used in connection with a securities trading account would appear to fit within the assigned "contracts related to the business."

Additionally, as defendant points out, the RDS agreements were explicitly listed as material contracts in Schedule 4.02(h)(i) to the APA. See Park Decl. Ex. 3 Item 59. Schedule 4.02(h)(I) refers to section 4.02 of the APA, in which the contracts to which the seller was bound are disclosed. Plaintiff attempts to argue that where Schedule 4.02(h)(i) refers to "Risk Disclosure Statement and Trading Acknowledgment" as a material contract, such agreements were actually excluded from the

11

asset transfer in the APA because of language in the APA that excluded from material contracts "trading commitments with customers or counterparties to purchase or sell securities in the ordinary course of business and consistent with past practice." Park Decl. Ex. 2 § 4.02(h)(i). However, the language of APA and Schedule 4.02(h)(i) illustrate that Risk Disclosure Statements and Trading Acknowledgments are distinguishable from the excluded trading commitments referred to in section 4.02. Plaintiff's argument is unconvincing.

The APA and Schedule 4.02(h)(i) reveal that there is no material issue of fact as to whether a valid assignment of the RDS agreements from Carlin to defendant occurred. Having found a valid assignment, there is no indication that defendant would not be the assignee of the RDS agreements with rights to enforce the same, including the arbitration provisions. See I.S. Joseph Co. v. Michigan Sugar Co., 803 F.2d 396, 400 (8th Cir.1986) (stating that assuming a valid assignment, the assignee could enforce an arbitration provision entered into by the assignor); Gadberry v. Rental Services Corp., 2011 WL 766991, at *4-5 (D.S.C. Feb. 24, 2011) (citing I.S. Joseph Co.). Having found that a valid assignment occurred, the court now turns to whether the arbitration agreement validly assigned can be enforced against plaintiff under principles of contract law.

North Carolina contract law guides the court's analysis as to whether the RDS agreements, particularly the second RDS, which supersedes the first, can be enforced to compel arbitration against plaintiff. Particularly, the question is whether a nonsignatory to the second RDS, like defendant, can compel plaintiff, a signatory, to abide by the language in the RDS requiring arbitration. The law of the Fourth Circuit and of North Carolina is "well-established . . . that a nonsignatory to an arbitration clause may, in certain situations, compel a signatory to the clause to arbitrate the signatory's claims against the nonsignatory despite the fact that the signatory and

nonsignatory lack an agreement to arbitrate." American Bankers Ins. Group, Inc. v. Long, 453 F.3d 623-27 (4th Cir. 2006); Klopfer v. Queens Gap Mountain, LLC, 816 F.Supp.2d 281, 298 (W.D.N.C. Sept. 15, 2011) (citing the same rule); Ellen v. A.C. Schultes of Maryland, Inc., 172 N.C. App. 317, 320, 615 S.E.2d 729, 732 (2005); see also Ellison v. Alexander,700 S.E.2d 102, 110 -111 (N.C. Ct. App. 2010). The Fourth Circuit has announced that equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the agreement in asserting its claims against the nonsignatory. American Bankers Ins. Group, Inc., 453 F.3d at 626-27. Thus, the court should examine the underlying complaint to determined whether estoppel should apply. Id.

Plaintiff's complaint acknowledges that defendant acquired Carlin. The complaint further describes plaintiff's success trading with the Carlin platform and difficulties trading with defendant's Accel platform. Plaintiff alleges that defendant switched to the Accel platform without providing adequate support for it, and that defendant lacked the infrastructure to properly support the platform. Plaintiff also alleges defendant's strategy to phase out retail traders like plaintiff. Plaintiff's first cause of action is for fraud. The fraud claim alleges that even before defendant acquired Carlin, it was planning to phase out retail traders while simultaneously inducing retail traders to continue trading with the Accel platform so that defendant would enjoy large commissions. While plaintiff's complaint avoids mention of the RDS agreements, the relationship between Carlin and plaintiff as set forth in the RDS agreements is obliquely referenced in the fraud claim where plaintiff's claim repeatedly references what plaintiff expected from defendant in trading, what plaintiff understood the trading relationship to be, and the benefits to the parties from the trading relationship, particularly the commission due defendant as Carlin's assignee.

13

Plaintiff's second count is for unfair and deceptive trade practices, which he asserts as an alternate theory of recovery and does not allege specific facts with regard to the same. Where plaintiff's claim incorporates by reference the preceding paragraphs of the complaint, including the fraud claim, the court's analysis is the same.

Plaintiffs third cause of action is for unjust enrichment. Plaintiff alleges that defendant collected commissions from plaintiff for trades executed subsequent to defendant's's acquisition of Carlin, that defendant knowingly retained the benefit of the commissions, yet did not provide plaintiff with the benefit of a functional trading platform. This claim, like the preceding one, finds its basis in the language of the RDS, which sets forth the relationship between the trader and the firm and discusses commissions for the latter.

Plaintiff's fourth cause of action alleges breach of implied contract. Plaintiff alleges that upon information and belief, there was no written contract governing the business relationship of plaintiff. Plaintiff's claim avoids acknowledging the existence of the RDS agreements, yet again, the substance of this claim is based on "an implied contract between Plaintiff and Defendant developed whereby Defendant provided access to its trading platform and technical support and Plaintiff paid commissions to Defendant on trades made by Plaintiff," Compl. ¶ 53, which contract is not "implied" at all, but set forth in the RDS agreements, which specifically contemplated that plaintiff would pay commissions on trades, and Carlin, acquired by defendant, would provide access to a trading platform.[5]

---

[5] While plaintiff's complaint suggests there was no contract between plaintiff and defendant, plaintiff attempts to argue both ways by alleging in his response that under North Carolina law, assignment of contract rights is not permitted where the contract was entered into out of personal confidence in the other contracting party. Putting aside the implicit suggestion that this argument assumes the RDS agreements were contracts, the court agrees with defendant that the very language of the RDS agreements, which plaintiff signed, belies the contention that they were entered into
(continued...)

Plaintiff's fifth and sixth causes of action allege negligent misrepresentation and negligence. Plaintiff alleges, among other things, a breach of a duty to prepare, obtain, and communicate information to him. He states that defendant owed him a duty of care to provide a trading platform that operates to the standard required for the type of trading conducted by plaintiff. Again, the duties plaintiff cites are oblique references to the substance of the RDS agreements, which outline the risks plaintiff accepted when he agreed to trade with Carlin and plaintiff's acknowledgment of what the firm was not responsible for.

Plaintiff's claims arise out of and relate directly to the RDS agreements, which contemplated the relationship between "trader" (plaintiff) and "the firm," which included Carlin as well as its employees, representatives, officers, directors, agents, successors and assigns. Park Decl. Ex. 6, 2. Plaintiff has "asserted claims in the underlying suit that, either literally or obliquely, assert a breach of a duty created by the contract containing the arbitration clause." American Bankers, 453 F.3d at 629; Klopfer, 816 F.Supp.2d at 295 (citing American Bankers and finding equitable estoppel under North Carolina law where, among other things, plaintiffs seeking not to enforce arbitration agreement alleged claims of unjust enrichment and unfair and deceptive trade practices, among others, against nonsignatory defendants). There is no question that plaintiff agreed to arbitrate disputes arising out of the relationship set forth in the RDS agreements. His signature is on each page of both agreements, including the pages describing the arbitration requirement. See Revels v. Miss North Carolina Pageant Organization, Inc., 176 N.C.App. 730, 734-35, 627 S.E.2d 280, 283

---

[5](...continued)
out of personal confidence in Carlin. See Park Decl. Ex. 6 p. 4-5 ("I represent that I solely am responsible in full for the selection and decision to purchase and sell securities through my account . . . ."). Rather, the language of the RDS agreements suggest that plaintiff agreed to the terms of the agreements in order to use a trading platform from which he would make his own investment decisions.

(N.C.App. 2006) ("In the instant case, it is clear that Revels assented to all terms of the contract including the arbitration clause. Revels' signature appears at the end of the contract on the signature line and, further, Revels placed her initials on each page of the contract, including the one containing the arbitration clause. No ambiguity exists as to whether there was assent to each of the terms.").

Accordingly, the court finds that plaintiff signed two RDS agreements that illustrate his agreement to arbitrate disputes arising out of the trading relationship. The RDS agreements were validly assigned to defendant, and under principles of equitable estoppel, defendant, even as a nonsignatory to the arbitration agreements, may enforce the same. The court finds the requirements to compel arbitration to be met. See Rose, 816 F.Supp.2d at 252.[6] Notably, plaintiff does not argue that the instant dispute is not covered by the arbitration agreement. Taking into consideration this and factors discussed herein, as well as the strong presumption in favor of arbitration, the court grants defendant's motion to stay the action and compel arbitration. See, e.g., Moses H. Cone Mem. Hosp. v. Mercury Const. Corp., 460 U.S. 1, 25-26 (1983), superseded by statute on other grounds as recognized by Finnie v. H&R Block Finan. Advisors, Inc., 307 F.App'x 19 (8th Cir. 2009). No genuine issue of fact existing as to whether there is a valid agreement to arbitrate, plaintiff's request for a jury trial to determine that issue is denied.

C.     Motion to Seal

Lastly, the court addresses defendant's motion to seal three exhibits offered in support of the motion to compel arbitration. These exhibits have been referred to previously herein. They include: Exhibit 2 to the Park Declaration, the Purchase and Sale Agreement between defendant and various entities related to the Carlin Group, dated October 25, 2006; Exhibit 3 to the Park Declaration,

---

[6] Plaintiff does not dispute that the latter two requirements of the

16

Schedule 4.02(h)(i) to the Purchase and Sale Agreement; and Exhibit 4 to the Park Declaration, Amendment No. 1 to the Purchase and Sale Agreement, dated January 1, 2007. Opposition to the request has been lodged by plaintiff, who argues that defendant has failed to show how the alleged "confidential information" in the proposed sealed exhibits overcomes the presumption of public access and that the proposed sealed documents are judicial documents to which the presumption of access attaches.

The Fourth Circuit had occasion to succinctly state the law regarding the sealing of documents in <u>Stone v. Univ. of Maryland Med. Sys. Corp.</u>, 855 F.2d 178, 180-81 (4th Cir. 1988), which the undersigned substantially relies on in the following discussion.[7] The common law presumes a right to inspect and copy judicial records and documents. <u>Nixon v. Warner Communications, Inc.</u>, 435 U.S. 589, 597 (1978). This presumption of access may be overcome if competing interests outweigh the interest in access. <u>See</u> <u>Rushford v. The New Yorker Magazine, Inc.</u>, 846 F.2d 249, 253 (4th Cir. 1988); <u>In re Washington Post Co.</u>, 807 F.2d 383, 390 (4th Cir. 1986). Where the First Amendment guarantees access, on the other hand, access may be denied only on the basis of a compelling governmental interest, and only if the denial is narrowly tailored to serve that interest. <u>Rushford</u>, 846 F.2d at 253 (citing <u>Press-Enterprise Co. v. Superior Court</u>, 464 U.S. 501, 510 (1984)).

Different levels of protection may attach to the various records and documents involved in a case. While the common law presumption in favor of access attaches to all "judicial records and documents," <u>Nixon</u>, 435 U.S. at 597, the First Amendment guarantee of access has been extended

---

[7] Based on the current procedural posture of this case, the parties have not yet had opportunity to alert the court as to whether a protective order would be necessary. The court notes that its instructions regarding proposed protective orders also borrow heavily from <u>Stone</u>.

to particular judicial records such as documents filed in connection with summary judgment motion in civil cases. See, e.g., Rushford, 846 F.2d at 253. Because the First Amendment and the common law provide different levels of protection, it is necessary to determine the source of the right of access before the court can accurately weigh the competing interests at stake.

Those competing interests must be weighed in accord with the procedures mandated by In re Knight Publishing Co., 743 F.2d 231 (4th Cir. 1984). Under Knight, a court must first give the public notice of a request to seal and a reasonable opportunity to challenge it. Id. at 235. While individual notice is unwarranted, the court must at least docket a request to seal "reasonably in advance of deciding the issue." Id. The court must consider less drastic alternatives to sealing and, if it decides to seal documents, must "state the reasons for its decision to seal supported by specific findings, and the reasons for rejecting alternatives to sealing in order to provide an adequate record for review." Id.

Under In re Knight, the court has already given public notice of defendants' request to seal by filing the same on the docket. As to the other requirements under Knight, while the court is sympathetic to defendant's efforts to protect confidential information, defendant's motion to seal and reply in support simply do not provide enough basis for the court to determine at this point that the right to access should be prohibited. Defendant places heavy reliance on the confidentiality clause in the Purchase and Sale Agreement. Park Decl. Ex. 2 § 5.02. That clause, however, is quite broad, and itself seems to contemplate the possibility that disclosure of parts of the Agreement might be required. Additionally, defendant cites no authority to suggest that the mere existence of such a clause automatically renders the entire document and related documents necessary to be filed under seal. The court also notes that defendant offers no argument as to why Exhibit 3, the Schedule

18

4.02(h)(i) or Exhibit 4, the Amendment 1 to the Purchase and Sale Agreement, should be sealed. Instead, defendant's argument as to these two exhibits appears to be that because they relate to the Purchase and Sale Agreement, they also fall under the general confidentiality clause.

More importantly, the court finds defendant's arguments for placing the exhibits under seal unpersuasive. Defendant notes that the documents "contain confidential commercial information regarding transactions entered by RBC with private entities and individuals. As part of the terms of these transactions, the documents describe private financial and personal information about the transactions and the individuals." Def.'s Mot. Seal 4. However, defendant's motion and reply in support offer nothing in addition to this statement to show specifically what about the documents renders them confidential and how public filing of the documents would hurt defendant or other parties, including harming an individual's or entity's "competitive standing." See Big Rock Sports, LLC v. AcuSport Corp., No. 4:08-CV-00159, 2011 WL 1213071 at *1-2 (E.D.N.C. Mar. 31, 2011).

As the parties point out, documents containing trade secrets and proprietary information are often placed under seal; however, defendant has only alleged "confidential commercial information," and such a generalized description does provide a sufficient basis for the court to overcome the common law presumption of access to documents. See Nixon, 435 U.S. at 597. Particularly, where the court must determine whether alternatives to sealing exist, with the showing defendant has currently made, the court cannot determine that redaction would not satisfy defendant's concern that individual names or specific information should not be publicly disclosed. Additionally, defendant offers no factual basis on which the court would make specific factual findings justifying sealing and showing that alternatives to sealing would be insufficient, as is required by Fourth Circuit law. See In re Knight, 743 F.2d at 235.

19

The court finds the cases defendant cites in support of sealing to be unpersuasive. In re Policy Mgmt. Sys. Corp., 67 F.3d 296, 1995 WL 541623 (4th Cir. 1995) is readily distinguishable where the documents to be sealed in that case were not considered by the court because of the strictures of Rule 12(b)(6) in ruling on a motion to dismiss. In considering the instant motions, however, this court is not limited to the consideration of the pleadings.[8] Defendant even describes the proposed sealed documents as "crucial to the issues raised in [defendant's] motion to compel arbitration and the court's consideration of those issues." Def.'s Mot. Seal 2. With this comment in mind, it is hard to credit defendant's assertion in its reply that the court's consideration of the same exhibits would be merely "indirect." Def.'s Reply 3. While defendant cites other case law from district courts in other circuits to support sealing the exhibits, none of the cases are persuasive authority for this court, and moreover, each of the cases presents different factual scenarios from this case and involve situations where there was no objection to sealing the document(s) in question.

Accordingly, defendant's motion to seal the exhibits currently lodged on the docket is denied. Should defendant find specific "confidential commercial information regarding transactions entered by RBC with private entities and individuals . . . [that] describe private financial and personal information about the transactions and the individuals" which, if disclosed would be harmful to the individuals or entities, defendant is free to make such a specific showing to the court through a motion to redact such information from the documents before placing them on the public docket.[9]

---

[8] Reference is made to the previous discussion that the court is to apply a summary judgment standard of analysis to a motion to compel arbitration.

[9] The court notes that plaintiff has access to the sealed versions of the exhibits, therefore redactions will not hinder plaintiff's ability to understand the un-redacted portions.

**CONCLUSION**

For the foregoing reasons, the court GRANTS defendant's motion to compel arbitration and stay action (DE # 10), DENIES defendant's motion to seal selected exhibits (DE # 12), and GRANTS plaintiff's motion to strike (DE # 18). This action is STAYED pending resolution of arbitration. If, after arbitration, issues remain to be decided by this court, the parties shall file status report indicating that the case remains ongoing. Thereafter, the Clerk will issue the appropriate initial order so that case schedule may put into place.

SO ORDERED, this the 5th day of July, 2012.

LOUISE W. FLANAGAN
United States District Judge